COAST LAW GROUP, LLP
MARCO A. GONZALEZ (SBN 190832)
LIVIA BORAK BEAUDIN (SBN 259434)
NATALIE CLAGETT (SBN 351072)
1140 South Coast Highway 101
Encinitas, CA 92024
Ph: (760) 942-8505
Email: marco@coastlawgroup.com

SAN DIEGO COASTKEEPER
PATRICK MCDONOUGH (SBN 288285)
COURTNEY BROWN (SBN 360257)
8305 Vickers Street, Suite 209
San Diego, CA 92111
Ph: (760) 525-6838
Email: patrick@sdcoastkeeper.org

Attorneys for Plaintiffs
SAN DIEGO COASTKEEPER and COASTAL ENVIRONMENTAL RIGHTS
FOUNDATION

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAN DIEGO COASTKEEPER, a non-profit corporation; COASTAL ENVIRONMENTAL RIGHTS FOUNDATION, a non-profit corporation, | Case No. 3:24-cv-00663-JES-VET |
| | **FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES** |
| Plaintiffs, | |
| v. | |
| | **(Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq.*)** |
| UNITED STATES INTERNATIONAL BOUNDARY AND WATER COMMISSION, an agency of the United States; MARIA-ELENA GINER, in her official capacity as Commissioner of the International Boundary and Water Commission; VEOLIA WATER WEST OPERATING SERVICES, INC., a Delaware Corporation; | |
| Defendants. | |

FIRST AMENDED COMPLAINT                    1

Coastal Environmental Rights Foundation, ("CERF") and San Diego Coastkeeper ("Coastkeeper") (collectively "Plaintiffs"), by and through their counsel, hereby allege:

## I.    JURISDICTION AND VENUE

1.    This is a civil suit brought under the citizen suit enforcement provision of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.* ("Clean Water Act" or "CWA"). *See* 33 U.S.C. § 1365. This Court has subject matter jurisdiction over the parties and this action pursuant to 33 U.S.C. § 1365(a)(1) and 28 U.S.C. §§ 1331 and 2201.

2.    On January 30, 2024, Plaintiffs issued a 60-day notice letter ("Notice Letter") to the International Boundary and Water Commission – United States Section ("USIBWC") and Veolia Water North America-West, LLC ("Veolia North"), as the owners and/or operators of the South Bay International Wastewater Treatment Plant ("SBIWTP") located at 2995 Clearwater Way, San Diego, CA 92154, appurtenant canyon collector systems, and other associated infrastructure (collectively the "Facility"), regarding violations of the Clean Water Act and its National Pollutant Discharge Elimination System Permit ("NPDES") Order No. R9-2014-0009, NPDES No.CA0108928, and Order No. R9-2021-0001, NPDES No. CA0108928, as amended by Order No. R9-2023-0009 ("Permit").

3.    True and correct copies of the Notice Letter and all enclosures are attached hereto as Exhibit 1 and incorporated herein. True and correct copies of the Permit and all enclosures are attached hereto as Exhibit 2 and incorporated herein.

4.    Plaintiffs mailed the Notice Letter via certified mail to (1) the Facility's physical address, 2995 Clearwater Way, San Diego, CA 92154; (2) Maria-Elena Giner, the Commissioner of USIBWC at 4191 North Mesa Street, El Paso, Texas, 79902;  (3) Veolia North's agent for service of process in California at 330 N. Brand Boulevard, Glendale, California, 91203 (4) Veolia North at 120 Water Street, Suite 212, North Andover, MA 01845; (5) Veolia North at 53 State Street, 14th Floor, Boston MA 02109; and (6) Veolia North at PO Box 430239, San Diego CA 92143.

5.      Plaintiffs also mailed the Notice Letter to the Administrator of the United States Environmental Protection Agency ("EPA"), the Administrator of EPA Region IX, the Executive Director of the California State Water Resources Control Board ("State Board"), the Executive Officer of the San Diego Regional Water Quality Control Board ("Regional Board"), and U.S. Attorney General at the U.S. Department of Justice as required by 40 C.F.R. § 135.2(a)(3) and 33 U.S.C. § 1365(b)(1)(A).

6.      More than sixty (60) days have passed since the Notice Letter was served on USIBWC, Veolia North, and the State and Federal agencies. Plaintiffs are informed and believe, and thereon allege, that neither the EPA nor the State of California has commenced or is diligently prosecuting an action to redress the violations alleged in the Notice Letter and in this Complaint. *See* 33 U.S.C. § 1365(b)(1)(B). This action is not barred by any prior administrative penalty under Section 309(g) of the CWA. 33 U.S.C. § 1319(g).

7.      Venue is proper in the Southern District of California pursuant to 33 U.S.C. § 1365(c)(1) because the source of the violations is located within this judicial district.

## II.    **INTRODUCTION**

8.      Defendant Veolia Water West Operating Services, Inc. ("Veolia Water") is under contract with USIBWC to operate and maintain the SBIWTP and its associated infrastructure.

9.      The Facility has discharged and continues to discharge pollutants such as fecal bacteria, contaminated sediment, heavy metals, and toxic chemicals into the Tijuana River and Estuary, and the Pacific Ocean (collectively "Receiving Waters") in violation of the express terms and conditions of the Permit and Clean Water Act, 33 U.S.C. Section 1342.

10.     The Facility's long-established pattern of failing to comply with numerous provisions of the Permit has resulted in devastating consequences to human health and the environment.

11.     The magnitude of the international transboundary sewage and wastewater

crisis cannot be overstated. Over the past five years, over 100 billion gallons of transboundary flows containing untreated sewage, bacteria and viruses, heavy metals, pesticides, sediment, trash, and toxic chemicals, have flowed from Mexico into Southern California via the Tijuana watershed.

12.    The Facility routinely discharges these same pollutants into the Pacific Ocean via the Facility's South Bay Ocean Outfall ("SBOO"), and into the Tijuana River and Estuary via leaks and spills from their canyon collectors and other infrastructure, in violation of the Permit.

13.    This human health, environmental justice, and ecological disaster is directly impacting public health, and denying local community members the right to live and recreate in a safe and clean environment. Recent studies have found that aerosolized sewage pollutants are often present in the air in Imperial Beach, San Ysidro and other South San Diego County border communities at levels that present a likely public health threat to people in those communities. **People living in the vicinity of the Tijuana River, Tijuana River Estuary, and the Facility are routinely exposed to aerosolized bacterial pathogens from raw sewage. In addition, the City of Imperial Beach's public beach had been closed for more than 1,000 consecutive days between December 2021 and September 2024.** Public beaches north of Imperial Beach to Coronado have also been closed intermittently for hundreds of days over the past decade, due to transboundary flows of raw sewage and untreated or poorly treated discharges from the Facility contaminating coastal waters. Discharges contaminated with pathogens, chemicals, sediment, and trash are also severely degrading the Tijuana River Estuary and offshore marine habitat. This harms local businesses and tourism.

14.    California has lost more than 95% of its coastal wetlands, further underscoring the importance of protecting these waterbodies and ecosystems from pollution. The Tijuana River Estuary is one of the last intact saltwater estuaries in California, and accordingly holds the prestigious designation as a protected wetland under the Ramsar Convention, a special status given to wetlands that provide

1 extraordinary ecosystem services. The estuary is home to numerous fish and shellfish,

2 over 370 types of birds, numerous mammal species, vital macro- and micro-invertebrates,

3 and several species at-risk for extinction and protected under the Federal and California

4 Endangered Species Acts.

5        15.    Pursuant to the 1944 treaty between the United States and Mexico,

6 *Utilization of waters of the Colorado and Tijuana Rivers and of the Rio Grande*, the

7 International Boundary and Water Commission ("IBWC") was established to resolve

8 water quality issues related to transboundary pollution from border rivers and streams.

9 The IBWC consists of two sections, the USIBWC and the Mexico Section (La Comision

10 Internacional de Limites y Aguas or "CILA"). Each section has exclusive jurisdiction and

11 control over works constructed, acquired and/or used to fulfill its treaty obligations on its

12 respective side of the international border.

13       16.    To fulfill its obligations under this Treaty, USIBWC designed and built the

14 Facility to intercept and treat dry weather flows in order to protect waters in the United

15 States.

16       17.    At its core, the Permit requires USIBWC to capture certain dry weather

17 wastewater flows from Mexico, divert these flows to the SBIWTP, and treat them to

18 specific standards enumerated in the Permit, before discharging up to 25 million gallons

19 per day ("MGD") through the SBOO to the Pacific Ocean. The Permit includes Effluent

20 Limitations, Receiving Water Limitations, Discharge Prohibitions, and monitoring and

21 reporting requirements, among other provisions.

22       18.    Following decades of deferred maintenance and neglect, Defendants'

23 failures to properly maintain and operate the Facility have resulted in hundreds of

24 ongoing Permit violations.

25       19.    Since November 1, 2018, the **Facility's discharges from the SBOO have**

26 **violated Permit Effluent Limitations on over 500 occasions**.

27       20.    The Facility also routinely discharges bacteria and pathogens far in excess of

28 the Permit's bacterial Receiving Water Limitations, intended to protect ocean waters for

recreation and shellfish harvesting uses.

21.    The Permit also incorporates various Discharge Prohibitions to protect the Tijuana River and Estuary from further degradation. However, through habitual dry weather canyon collector spill events, the Facility routinely violates Discharge Prohibitions pertaining to bacteria, nitrogen, phosphorus, lead, turbidity, dissolved oxygen, and pH.

22.    For example, between November 2020 and February 2021, there were 19 dry weather transboundary flows at the Stewart's Drain canyon collector resulting in the discharge of over 1.2 million gallons of untreated wastewater. While Defendants frequently fail to monitor or report pollutant levels in such spill events, the pollutant contribution can be staggering – during a January 7, 2022 Spill Event, Enterococcus levels at Stewart's Drain measured 5,000,000 cfu/100ml, over 45,000 times higher than the Permit's bacterial objective of 110 cfu/100ml. **Further, the Facility's discharges from the SBOO into the ocean have only complied with the Permit's bacteria objectives in six out of the last sixty-two months.**

23.    Defendants have also regularly failed to submit self-monitoring reports, depriving the public of meaningful access to information about the Facility's discharges. Shockingly, the Facility neglected to document at least 239 effluent violations as mandated by the Permit. This requirement is not only a legal mandate but a crucial aspect of public trust and accountability. These violations are particularly troubling given that USIBWC is a federal agency that exists for the benefit and welfare of the public, and as such, the public has a fundamental right to full transparency on every aspect of the transboundary pollution crisis.

24.    The types of violations enumerated above have been ongoing for many years and have persisted despite numerous attempts from regulators and other parties to bring the Facility into compliance with the Permit.

25.    The San Diego Regional Water Quality Control Board ("Regional Board"), the regulatory agency tasked with enforcing the Permit, issued Notices of Violation

("NOVs") to USIBWC in February 2021, September, October, November, and December 2023and nearly monthly throughout 2024; a Cease and Desist Order in May 2021, which was amended in December 2021; a Time Schedule Order in December 2023; and an Investigative Order on February 18, 2025, all of which are or were intended to bring the Facility into compliance with the Permit, but all of which have failed to do so.

26. In July 2020, Congress appropriated $300 million through the US-Mexico-Canada Agreement ("USMCA") to mitigate the transboundary flows through expansion of the existing SBIWTP. In 2021, IBWC estimated that the cost to double the capacity of the SBIWTP from 25 MGD to 50 MGD would be approximately $300 million.

27. In July 2022, USIBWC and CILA entered into an agreement, Minute 328 of the USMCA, which identified a suite of infrastructure projects on both sides of the border ("Comprehensive Infrastructure Solution"). The lynchpin of the Comprehensive Infrastructure Solution is the expansion of the SBIWTP, then still estimated to cost $300 million.

28. However, in the spring of 2023, USIBWC announced that it had woefully underestimated the cost of SBIWTP expansion, which would now cost $600 million. Due to years of underfunding, deferred maintenance, neglect, and poor management, the SBIWTP was, and remains, in such a decrepit state that rehabilitation of the plant, just to bring it back to basic operating condition, will cost at least $150 million. The latest cost estimates for the implementation of the entire Comprehensive Infrastructure Solution are now nearly $1 billion dollars.

29. In March 2024, Congress authorized an additional $156 million for the USIBWC's construction projects for this fiscal year, a $103 million increase over last year's budget.

30. Despite being routinely notified of its violations, and notwithstanding Congress's piecemeal funding allocations, USIBWC's Permit violations continue due to Defendants' failures to adequately operate and maintain the Facility.

31. For example, the Facility has failed to maintain and operate a critical

junction box that regulates canyon collector flows since October 3, 2020.

32.    Given the magnitude of the human health and ecological consequences at stake, Plaintiffs believe urgent action is necessary. In light of Defendants' history of failure, a judicial decree is necessary to ensure Permit compliance. Without court intervention, Defendant's Permit violations will continue to jeopardize human health, pollute public beaches, and destroy the Tijuana River Estuary.

### III.    PARTIES

33.    USIBWC is a federal agency and at all relevant times the Owner of the Facility.

34.    USIBWC is charged with addressing transboundary issues arising out of agreements between the United States and Mexico, including, but not limited to, the Treaty of 1944. Pursuant this treaty, USIBWC is responsible for addressing waste entering the United States from Mexico along the Tijuana River watershed.

35.    To fulfill its obligations, USIBWC constructed, operates, and maintains, and/or contracts to operate and maintain, flood control and wastewater collection, conveyance, and treatment infrastructure in the Tijuana River Valley, including the 75-acre SBIWTP, five canyon collector systems, two pump stations that divert water from the canyon collectors to the SBIWTP, and other appurtenant infrastructure.

36.    Because operation of the Facility necessarily results in the discharge of waste to waters of the United States USIBWC applied for and received an NPDES permit from the San Diego Water Board in 2014 in order to lawfully operate the Facility.

37.    Defendant Maria-Elena Giner is the Commissioner of USIBWC and named only in her official capacity.

38.    Veolia North is an active Delaware Limited Liability Company.

39.    Veolia North is a wholly owned subsidiary of Veolia Water North America Operating Services, LLC.

40.    Defendant Veolia Water is an active Delaware Corporation. On information and belief, Veolia Water has contracted with USIBWC to operate and maintain the

FIRST AMENDED COMPLAINT                8

Facility since September 28, 2020.

41.     On information and belief, Veolia Water is a subsidiary of Veolia North.

42.     Veolia North and Veolia Water share the same registered agent, principal address, mailing address and many officers.

43.     Plaintiff Coastkeeper is a non-profit public benefit corporation organized under the laws of the State of California with its main office in San Diego, California. Coastkeeper is committed to protecting and restoring San Diego's coastal and inland waters and the communities who depend on them. A member of the international Waterkeeper Alliance, San Diego Coastkeeper's main purpose is to preserve, enhance, and protect San Diego's marine sanctuaries, coastal estuaries, wetlands, and bays from illegal dumping, hazardous spills, toxic discharges, and habitat degradation.

44.     Plaintiff CERF is a non-profit public benefit corporation organized under the laws of the State of California with its office located in Encinitas, California. CERF was founded by surfers in North San Diego County and is active throughout California's coastal communities. CERF was established to advocate for the protection and enhancement of coastal natural resources and the quality of life for coastal residents. One of CERF's primary areas of advocacy is water quality protection and enhancement.

45.     Many of Plaintiffs' members live and/or recreate in and around the Receiving Waters. Plaintiffs' members use and enjoy the Receiving Waters to fish, sail, boat, kayak, paddle board, surf, swim, hike, view wildlife and scenery, and engage in scientific studies and restoration efforts, among other activities.

46.     Plaintiffs and their members have an interest in accurate information about Defendants' discharges. Defendants' failure to report and monitor impedes Plaintiffs' members' ability to fully use and enjoy the Receiving Waters for aesthetic, recreational, scientific, educational, and spiritual purposes.

47.     Defendants' failure to comply with the procedural and substantive requirements of the Permit and the CWA results in discharges of contaminated water to the Receiving Waters. Defendants' polluted discharges degrade water quality and harm

aquatic life in the Receiving Waters and thus impair Plaintiffs' members' use and enjoyment of those waters.

48.     Defendants' violations of the Permit and Clean Water Act at the Facility are ongoing and continuous. Thus, the interests of Plaintiffs' members have been and will continue to be adversely affected by Defendants' failure to comply with the Clean Water Act.

49.     The relief sought herein will redress the harms to Plaintiffs' members caused by Defendants' activities. Continuing commission of the acts and omissions alleged herein will irreparably harm Plaintiffs' members, for which they have no other plain, speedy, or adequate remedy at law.

50.     An actual controversy exists as to the rights and other legal relations between Defendants and Plaintiffs.

## IV.   LEGAL BACKGROUND

### A.   The Clean Water Act

51.     The Clean Water Act requires point source discharges of pollutants to navigable waters be regulated by an NPDES permit. 33 U.S.C. § 1311(a); 40 C.F.R. § 122.21(a).

52.     Section 301(a) of the Clean Water Act prohibits the discharge of any pollutant into Waters of the United States unless the discharge complies with the CWA. Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to Section 402 of the CWA.

53.     "Waters of the United States" are defined as "navigable waters" and "all waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including waters which are subject to the ebb and flow of the tide." 33 U.S.C. § 1362(7); 40 C.F.R. § 120.2.

54.     The "discharge of a pollutant" means, among other things, "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12).

55.     The EPA interprets waters of the United States to include not only

traditionally navigable waters, but also other waters, including waters tributary to navigable waters, wetlands adjacent to navigable waters, and intermittent streams that could affect interstate commerce. *See* 40 C.F.R. § 120.2.

56.    The CWA confers jurisdiction over waters that are tributaries to traditionally navigable waters where the water at issue is relatively permanent, standing, or continuously flowing. 40 C.F.R. § 120.2.

57.    The CWA allows EPA to delegate NPDES permitting authority to states, which includes determining the NPDES permit conditions. 33 U.S.C. § 1342(b). California was delegated the NPDES permit program in 1973, with the San Diego Regional Water Quality Control Board serving as the regulatory agency which issues the NPDES permit which governs the Facility's operations and discharges.

58.    If granted a permit, the discharger must comply with all permit limitations and terms. Each and every violation of an NPDES permit is a violation of the CWA for which the permittee is liable, including liability for civil penalties. 40 C.F.R. § 122.41; Permit Attachment D § 1.1.1.

59.    Private citizens may sue under the Clean Water Act to enforce the specific provisions of the Clean Water Act. 33 U.S.C. § 1365(a)(1), (f)(6).

60.    Plaintiffs are persons as defined by the Clean Water Act and thus able to pursue citizen enforcement.

**B.    USIBWC's NPDES Permit Conditions**

61.    The Facility operates under the terms of the Permit, with which Defendants must comply. Exhibit 2.

62.    The Permit includes provisions governing, *inter alia*, (1) Effluent Limitations; (2) Discharge Prohibitions; and (3) Monitoring and Reporting.

63.    "The Discharger shall at all times properly operate and maintain all facilities and systems of treatment and control (and related appurtenances) which are installed or used by the Discharger to achieve compliance with the conditions" of the Permit. Permit Attachment D § 1.4.

### 1. Permit Discharge Prohibitions

64.    The Permit regulates the Facility's discharges from the SBOO at Discharge Point No. 001 ("DP-001"). More specifically, Section 3.1 of the Permit prohibits the "discharge of waste from the Facility "not treated by a secondary treatment process and not in compliance with the effluent limitations specified in section 4.1 of [the Permit], or to a location other than Discharge Point No. 001, unless specifically regulated by [the Permit] or separate WDRs." Permit § 3.1.

65.    The Permit also regulates certain Spill Events, defined as any "discharge, or any other type of emission or release, of waste from any portion of the Facility due to system overflow, flow stoppage, system leaks and breaks, operational failure and/or infrastructure failure." Permit § 6.3.2.1.1.1.

66.    Spill Events do not include (1) wet weather flows that bypass the canyon collectors, and (2) any portion of dry weather flows which exceed the maximum design capacity of the canyon collector and are not diverted by the canyon collector. *Id*. § 6.3.2.1.1.2; *see also* Fact Sheet § 6.2.2.1.4. at F-50.

67.    As such, "[a] dry weather Canyon Collector Transboundary Flow Event also constitutes a Spill Event when transboundary flows less than or equal to the canyon collector's maximum design capacity are not captured by the canyon collector for treatment at the SBWITP and disposal through the SBOO (i.e., dry weather canyon collector Spill Event)." *Id*. § 6.3.2.1.1.2, emphasis added.

68.    However, USIBWC "shall be deemed in compliance with Discharge Prohibition 3.1 with respect to dry weather canyon collector Spill Events, . . . if the Discharger implements its Spill and Transboundary Flow Event Prevention and Response Plan" ("Spill Prevention Plan"). Permit § 3.1.1.

69.    This "safe-harbor" provision was added to the Permit via an amendment in 2023, due in part to the Facility's numerous dry weather canyon collector Spill Events, each of which were strict violations of the previous iterations of the Permit.

70.    Discharge Prohibition 3.3 requires the Facility to also comply with the

discharge prohibitions in the *Water Quality Control Plan for the San Diego Basin* ("Basin Plan"). Permit § 3.3.

71.     There is no safe harbor provision for compliance with Discharge Prohibition 3.3, and as such, the "Spill Prevention Plan" exception does not exempt the Facility from the Basin Plan discharge prohibitions.

72.     Basin Plan Chapter 4, Waste Discharge Prohibition (5) states, in relevant part: "The discharge of waste to inland surface waters, except in cases where the quality of the discharge complies with applicable receiving water quality objectives, is prohibited. Allowances for dilution may be made at the discretion of the Regional Board." Basin Plan at 4-31; *see also* Permit Attachment G § 2.5.

73.     "Waste" is defined as, "waste substances, liquid, solid, gaseous, or radioactive, associated with human habitation, or of human or animal origin, or from any producing, manufacturing, or processing operation." California Water Code, § 13050(d).

74.     "Where consideration of a dilution allowance or mixing zone is not permitted by the water quality standards or is not appropriate, the relevant water quality criterion must be attained at the point of discharge." U.S. EPA's NPDES Permit Writer Manual § 6.2.3.

75.     Accordingly, where the "quality of the discharge" does not meet water quality objectives, the discharge, absent an express "allowance for dilution" by the San Diego Regional Board, is prohibited.

76.     Chapter 3 of the Basin Plan sets forth numerous Water Quality Objectives, all of which are incorporated into the Permit via Discharge Prohibition 3.3.

77.     For contact recreation waters where the salinity is greater than 1 ppt more than 5 percent of the time, the Basin Plan Objective for Enterococci is 30 cfu/100ml using a six-week rolling geometric mean, or 110 cfu/100 ml statistical threshold value ("STV") not to be exceeded by more than 10 percent of the samples collected in a calendar month. Basin Plan at 3-15, 3-16.

78.     For contact recreation waters where the salinity is less than or equal to 1 ppt

more than 95 percent of the time, the Basin Plan Objective for E. coli is 100 cfu/100ml using a six-week rolling geometric mean, or 320 cfu/100 ml STV not to be exceeded by more than 10 percent of the samples collected in a calendar month.

79.     For waters with a beneficial use of shellfish harvesting, the median total coliform concentration throughout the water column for any 30-day period shall not exceed 70 organisms per 100 ml nor shall more than 10 percent of the samples collected during any 30-day period exceed 230 organisms per 100 ml for a five-tube decimal dilution test or 330 organisms per 100 ml when a three-tube decimal dilution test is used. *Id*. at 3-16.

80.     The Basin Plan Water Quality Objective for phosphorus in the Tijuana River is 0.1 mg/L. *Id*. 3-47.

81.     The Basin Plan Water Quality Objective for nitrogen in the Tijuana River is 1.0 mg/L. *Id*.

82.     The Basin Plan Water Quality Objective for turbidity in the Tijuana River is 20 NTU. *Id*.

83.     The Basin Plan states that "dissolved oxygen levels shall not be less than 5.0 mg/l in inland surface waters" designated with a warm freshwater habitat beneficial use. One beneficial use of the Tijuana River is warm freshwater habitat. *Id*. at 3-20.

84.     In the Tijuana Estuary, the pH shall not be depressed below 7.0 nor raised above 9.0. In the Tijuana River, the pH shall not be depressed below 6.5 nor raised above 8.5. *Id*. at 3-21.

85.     Chapter 3 of the Basin Plan confirms the California Toxics Rule ("CTR") is a "water quality criteria" that applies to California inland surface waters, enclosed bays, and estuaries. Basin Plan at 3-34, 3-35.

86.     The CTR sets forth continuous and maximum levels for numerous toxic pollutants, in both freshwater and saltwater environments. *See* 40 C.F.R. § 131.38.

87.     The Tijuana River is an inland surface water, and the Tijuana River Estuary constitutes an estuary, both of which are subject to the Basin Plan Discharge Prohibition,

FIRST AMENDED COMPLAINT          14

and therefore CTR. Thus, the Facility's discharges into the Tijuana River and Estuary must also meet CTR criteria.

88.    In adopting the CTR, the EPA expressly directed that "[a]ll waters (including lakes, estuaries and marine waters) . . . are subject to the Criteria promulgated today. **Such criteria will need to be attained at the end of the discharge pipe, unless the State authorizes a mixing zone."** (Emphasis added) (65 FR 31682-01).

89.    The EPA further directed that "[t]hese Federal Criteria are legally applicable in California . . . for all purposes and programs under the Clean Water Act." *Id.*

### 2.  Permit Effluent Limitations

90.    Defendants must comply with the Effluent Limitations listed in Permit Section 4.1.1.1. These Effluent Limitations list pollutant parameters and the respective maximum limits based on various monthly, weekly, and daily limit calculations. Permit § 4, Table 2.

91.    These parameters include carbonaceous biochemical oxygen demand ("CBOD"), total suspended solids ("TSS"), settleable solids, turbidity, benzidine, DDT, heptachlor epoxide, hexachlorobenzene, PCBs, and toxaphene. *Id.*

### 3.  Permit Monitoring and Reporting Requirements

92.    The Permit's Monitoring and Reporting Program requires weekly monitoring of total and fecal coliforms, and enterococcus at "shoreline" monitoring locations S-4 through S-6, and S-8 through S-12, as well as the "kelp/nearshore" locations of I-19, I-24, I-25, I-26, I-32, I-39, and I-40. The Permit also requires monitoring of "offshore" locations I-1 to I-18, I-20 to I-23, I-27 to I-31, and I-33 to I-38. Permit Monitoring and Reporting Program ("MRP"), at Table E-1.

93.    The Permit requires the Facility to upload all self-monitoring reports to the California Integrated Water Quality System ("CIWQS").  For monthly monitoring reports, the deadline for submission is the first calendar month following the month of sampling, and for quarterly it is May 1, August 1, November 1, and February 1.  For both the monthly and quarterly reports, the Facility must "arrange all reported data in tabular

format." Permit MRP § 7.2.7. The data must also be "summarized to clearly illustrate whether the Facility is operating with interim and/or final effluent limitations." Permit MRP § 7.2.7. The Facility must "attach a cover letter" to the self-monitoring reports, which "identify[ies] violations of the waste discharge; discuss[es] corrective actions taken or planned; and proposed time schedule for corrective actions." Permit MRP § 7.2.7.  Finally, the Facility must "add all violations . . . to CIWQS under the Violations tab." Permit MRP § 7.2.7.

## V.    **FACTUAL BACKGROUND**

94.    The Facility is a Federally Owned Treatment Work owned by the USIBWC.

95.    The Facility is comprised of any devices and systems used in the storage, treatment, recycling, and reclamation of municipal sewage or industrial wastes of a liquid nature, including but not limited to the SBIWTP, five diversion structure canyon collectors, two pump stations, two junction boxes, and two outfall structures.

96.    The Facility discharges treated, partially treated, and at times untreated wastewater into the Pacific Ocean through the SBOO.

97.    The Facility also routinely discharges waste via spill events, overflows, and bypasses of the canyon collector systems, which continue north in the natural drainages, polluting the Tijuana River Valley and Estuary, the Tijuana River, and the Pacific Ocean at San Diego beaches near the mouth of the Tijuana River. This includes dry weather canyon collector Spill Events, as defined by Section 6.3.2.1.1.2 of the Permit, which are subject to the terms and requirements of the Permit.

98.    USIBWC and Veolia Water, as owners and/or operators of the Facility, have failed, and continue to fail, to properly operate and maintain the Facility.

99.    USIBWC's and Veolia Water's failures to properly operate and maintain the Facility have caused the Facility to discharge inadequately treated effluent via the SBOO in violation of the Permit.

100.    USIBWC's and Veolia Water's failures to properly operate and maintain the Facility have caused the Facility to discharge waste via the canyon collectors and pump

systems, into the Tijuana River Valley and Estuary, the Tijuana River, and the Pacific Ocean, in violation of the Permit.

101.   The canyon collectors were constructed to divert dry weather transboundary flows for treatment and discharge through the SBOO. Flows captured by the canyon collectors are conveyed by gravity or via pump to the SBIWTP headworks for treatment and, eventually, disposal through the SBOO. Spills, overflows, and bypasses of the canyon collector systems continue north into the Tijuana River Valley and Estuary, the Tijuana River, and the Pacific Ocean at San Diego beaches near the mouth of the Tijuana River. *Id.* at F-5 to F-7.

102.   The maximum design capacity for the five canyon collector systems is as follows:

| TABLE 2: CANYON COLLECTOR SYSTEM DESIGN CAPACITIES | | |
|---|---|---|
| **Canyon Collector System** | **Average Flow (MGD)** | **Peak Flow (MGD)** |
| Goat Canyon | 2.33 | 7 |
| Smuggler's Gulch | 4.67 | 14 |
| Canyon del Sol | 0.67 | 2 |
| Silva's Drain | 0.33 | 1 |
| Stewart's Drain | 1.67 | 5 |

103.   After the SBIWTP treats the wastewater, the Facility discharges effluent first into the South Bay Land Outfall ("SBLO") pipe. The SBLO starts at the SBIWTP and ends at the mouth of Goat Canyon, where it connects to the SBOO. *Id.* at § 2.2, at F-8. The SBOO then carries the waste over three nautical miles to its terminus, emptying into the Pacific Ocean off the coast near Imperial Beach, California. Although over three nautical miles, the pipe terminates within the waters of the United States due to its angle towards the international border.

**A.     The Impacted Receiving Waters**

104.   Receiving Waters are Waters of the United States, and thus are jurisdictional

under the Clean Water Act. The Pacific Ocean is navigable in fact and used in interstate and foreign commerce. The Tijuana River and Estuary are direct tributaries to the Pacific Ocean. They are also subject to the ebb and flow of the tide, and navigable in fact. *See* 33 U.S.C. § 1362(7); 40 C.F.R. § 120.2.

105.    The mouth of the Tijuana River meets the Pacific Ocean at Imperial Beach, forming an ecologically valuable estuary that forms a key part of Southern California's coastal desert biome. The Tijuana River and Estuary serve as natural filtration systems, effectively mitigating the impact of pollutants. They also act as carbon sinks, absorbing greenhouse gases and contributing to climate mitigation efforts. These habitats provide homes for a diverse array of species and serve as vital breeding grounds for both terrestrial and aquatic migratory species. The Tijuana River Estuary is a sanctuary for endangered species such as the salt marsh bird's beak and the California gnatcatcher, underscoring its significance in preserving biodiversity and the delicate balance of nature.

106.    The Imperial Beach coastal region hosts over 370 species of birds including marbled godwit sanderlings, western sandpipers, double-crested cormorants, California Brown Pelicans, and sensitive species such as the California terns and light-footed clapper rails.

107.    Marine life such as dolphins, whales, sea lions, sea turtles, rays, sharks, octopi, and an abundance of fish visit or reside within the coastal waters into which Defendants discharge.

108.    The Water Quality Control Plan for the San Diego Basin ("San Diego Basin Plan" or "Basin Plan") identifies the Beneficial Uses of water bodies in the region. The Beneficial Uses for the Tijuana River include Industrial Service Supply; Contact Water Recreation; Non-contact Water Recreation; Preservation of Biological Habitats of Special Significance; Warm Freshwater Habitat; Wildlife Habitat; and Rare, Threatened, or Endangered Species.

109.    The Beneficial Uses for the Tijuana River Estuary include: Contact Water Recreation; Non-contact Water Recreation; Commercial and Sports Fishing; Preservation

of Biological Habitats of Special Significance; Estuarine Habitat; Wildlife Habitat; Rare, Threatened, or Endangered Species; Marine Habitat; Migration of Aquatic Organism; Spawning, Reproduction, and/or Early Development; and Shellfish Harvesting.

110.   The Beneficial Uses for the Pacific Ocean include Industrial Service Supply; Navigation; Contact Water Recreation; Non-contact Water Recreation; Commercial and Sports Fishing; Preservation of Biological Habitats of Special Significance; Wildlife Habitat; and Rare, Threatened, or Endangered Species; Marine Habitat; Aquaculture; Migration of Aquatic Organism; Spawning, Reproduction, and/or Early Development; and Shellfish Harvesting.

111.   The Tijuana River is listed as impaired under Section 303(d) of the Clean Water Act for ammonia, total nitrogen, phosphorus, trace elements, benthic community effects, cadmium, chlorpyrifos, diazinon, eutrophic conditions, indicator bacteria, dissolved oxygen, malathion, pesticides, sedimentation/siltation, solids, surfactants, synthetic organics, and trash.

112.   The Tijuana River Estuary is listed as impaired under Section 303(d) of the Clean Water Act for eutrophic conditions, nickel, lead, pesticides, thallium, toxicity, turbidity, and trash.

113.   The Pacific Ocean Shoreline at (1) Otay Valley HA, at Carnation Ave and Camp Surf Jetty is impaired for indicator bacteria; (2) Imperial Beach Pier is impaired for total coliform for the shellfish harvesting beneficial use, PCBs, and trash; (3) Tijuana HU, at end of Seacoast Drive is impaired for indicator bacteria (enterococcus for contact recreation, and total coliform for shellfish harvesting beneficial uses); (4) Tijuana HU, at 3/4-mile North of Tijuana River is impaired for indicator bacteria (enterococcus for contact recreation, and total coliform for the shellfish harvesting beneficial uses); (5) Tijuana HU, at Cortez Avenue is impaired for indicator bacteria (total coliform for the shellfish harvesting beneficial use); (6) Tijuana HU, at Monument Road is impaired for indicator bacteria (enterococcus, fecal coliform, and total coliform for contact recreation, and total coliform for the shellfish harvesting beneficial uses); and (7) Tijuana HU, at the

1   international border is impaired for indicator bacteria (total coliform for the shellfish

2   harvesting beneficial use).

3       114.   As alleged below, the Facility has failed and continues to fail to comply with

4   the Permit's effluent limitations, discharge prohibitions, and monitoring and reporting

5   requirements, among other Permit terms, violating the CWA. These ongoing and

6   continuous violations result in devastating impacts to Southern California residents and

7   ecosystems.

8       **B.    Discharges in Exceedance of Permit Effluent Limitations**

9       115.   As reflected in Exhibit 1, the Facility continuously fails to comply with the

10  effluent limitations required by its Permit in Section 4.1.1.1. Over 500 effluent limitation

11  violations have been identified between January 30, 2019, and the present. *See* Notice

12  Letter, Ex. 1, Effluent Limitations Violations.

13      116.   Plaintiffs are informed, believe, and thereon allege the Facility's effluent

14  limitation violations are ongoing.

15      117.   The Facility has discharged several pollutants in violation of Permit Effluent

16  Limitations including carbonaceous biochemical oxygen demand ("CBOD"), total

17  suspended solids ("TSS"), settleable solids, turbidity, benzidine, DDT, heptachlor

18  epoxide, hexachlorobenzene, PCBs, and toxaphene. *Id*.

19      118.   Many of the Facility's discharges exceed applicable effluent limitations by

20  orders of magnitude, some of which are thousands of times the Permit limit. *Id*.

21      **C.    Transboundary Flows in Violation of Basin Plan Discharge Prohibitions**

22      119.   Plaintiffs are informed and believe, and thereon allege that the Facility, via

23  dry weather canyon collector transboundary flows which constitute Spill Events, as

24  defined in Section IV.B.1 *supra*, routinely discharges waste into the Tijuana River Valley

25  at levels exceeding Water Quality Objectives in the Basin Plan in violation of Permit

26  Discharge Prohibition 3.3.

27      120.   As detailed in Section IV.B.1 *supra*, Spill Events are subject to Permit

28  Discharge Prohibition 3.3, and no "safe harbor" applies.

FIRST AMENDED COMPLAINT                    20

121.   Discharge Prohibition 3.3, in particular, states the Facility "must comply with Discharge Prohibitions contained in chapter 4 of the *Water Quality Control Plan for the San Diego Basin* (Basin Plan), incorporated into this Order as if fully set forth herein."

122.   Basin Plan Discharge Prohibition (5) prohibits the "discharge of waste to inland surface waters, **except in cases where the quality of the discharge complies with applicable receiving water quality objectives**. Allowances for dilution may be made at the discretion of the Regional Board." Basin Plan at 4-31.

123.   The Regional Board has not made any applicable allowance for dilution for discharges from the Canyon Collectors into the Tijuana River and Estuary.

124.   Plaintiffs are informed and believe, and thereon allege the Facility's multiple, ongoing infrastructure and maintenance failures directly result in the regular discharge of untreated and partially treated sewage and other waste via dry weather canyon collector Spill Events, which results in the discharge of extremely high levels of multiple pollutants.

125.   The Permit itself notes that the Facility "discharged, discharges, or is suspected of discharging waste in the form of transboundary flows and other waste through the canyon collector systems it owns, operates, and maintains." Permit Attachment F § 7.2.2.

126.   For example, "[d]ry weather transboundary flows at the Stewart's Drain canyon collector have been increasing in frequency due to infrastructure issues in Mexico, as well as the SBIWTP. Between November 2020 and February 2021, there were 19 dry weather transboundary flows at the Stewart's Drain canyon collector resulting in the release of over 1.2 million gallons of untreated wastewater to waters of the U.S. and/or State." *Id.*

127.   The design capacity of Stewart's Drain is 1.67 million gallons per day.

128.   As such, the aforementioned nineteen dry weather transboundary flows over a three-month period totaled less than the Stewart's Drain daily capacity, strongly

indicating that each of these nineteen discharges of untreated wastewater constitute a dry weather canyon collector Spill Event covered by the Permit. Permit Fact Sheet at F-7.

129.   These nineteen Spill Events identified in the Permit, which transpired over a short, three-month period at one canyon collector, are merely illustrative, not exhaustive. Thus, Plaintiffs are informed, believe, and thereon allege that dry weather canyon collector Spill Events frequently occur at multiple canyon collectors.

130.   The Facility's own reporting further indicates the canyon collectors are frequently inoperable and thus evidence many dry weather Canyon Collector Transboundary Flow Events constitute Spill Events. For example, on March 7, 2023, the Facility notified the Regional Board that the Goat Canyon and Smugglers Gulch Canyon Collectors were both "out of service" due to excessive sediment buildup. These canyon collectors remained offline until March 10, while 8 million gallons of transboundary flows reached surface waters.

131.   Canyon Collector Daily Inspection logs also show canyon collectors are routinely not "operational" while flows bypass the collectors. For example, on January 2, 2022, Goat Canyon was not operational and 0.375 cubic feet per second was flowing through the collector from Mexico. On January 19, 2022, Goat Canyon collector was not operational and 0.833 cubic feet per second bypassed the collector. *Id*. The Facility reported Spill Events on February 23, 2022 at Goat Canyon and Smuggler's Gulch. These are just a few examples of the Facility's chronic and ongoing infrastructure issues that result in frequent Spill Events.

132.   Though it failed to sample these Spill Events, the Facility has routinely monitored dry weather canyon collector transboundary flows (some of which also constitute Spill Events) at Stewart's Drain. As detailed in Exhibits 5 and 6 to the Notice Letter, these samples consistently show the Facility routinely discharges extremely high concentrations of multiple pollutants, often orders of magnitude in excess of applicable Basin Plan Objectives and the CTR. *See* Exhibit 1.

133.   For example, during the January 7, 2022 transboundary flow event, bacteria

levels at Stewart's Drain exceeded Basin Plan Water Quality Objectives by orders of magnitude - Enterococcus measured 5,000,000 cfu/100ml, over 45,000 times higher than the Basin Plan objective of 110 cfu/100ml, and fecal coliform measured 3,500,000 cfu/100ml, 1,750 times higher than the Basin Plan objective of 4,000 cfu/100ml. *Id.*

134. A sample collected from Stewart's Drain on January 13, 2022 shows phosphorus at 10.3 mg/L, over 100 times higher than the Basin Plan objective of 0.1 mg/L.

135. A sample collected from Stewart's Drain on November 10, 2020 shows nitrogen at 90.2 mg/L, over 90 times higher than the Basin Plan objective of 1.0 mg/L.

136. A sample collected from Stewart's Drain on January 30, 2022 shows turbidity at 410 NTU, over 20 times higher than the Basin Plan objective of 20 NTU.

137. Chapter 3 of the Basin Plan confirms the California Toxics Rule ("CTR") is a "water quality criteria" that applies to California inland surface waters, enclosed bays, and estuaries. Basin Plan at 3-34, 3-35.

138. Plaintiffs are informed, believe, and thereon allege the dry weather Canyon Collector Transboundary Spill Events routinely result in the discharge of various toxic pollutants, in excess of CTR criteria.

139. These extremely polluted discharges from the Facility flow into the Tijuana River, Tijuana River Estuary, and eventually the Pacific Ocean at the mouth of the Tijuana River.

140. Plaintiffs therefore are informed, believe, and thereon allege, Spill Events at Goat Canyon, Smuggler's Gulch, and other canyon collectors similarly exceed numerous Water Quality Objectives, including but not limited to those for: nitrogen, phosphorus, indicator bacteria, lead, nickel, turbidity, dissolved oxygen, and pH.

141. As described *supra*, the Facility routinely discharges via <u>dry weather Canyon Collector Transboundary Flow Events, less than or equal to the canyon collector's maximum design capacity, which constitute</u> Spill Events, and these Spill Events are regulated by the Discharge Prohibitions of the Permit.

142.    Plaintiffs are informed, believe, and thereon allege these Spill Events are ongoing and result in discharges in excess of multiple applicable Water Quality Objectives, in violation of the Permit's Discharge Prohibition 3.3.

**D.    Failure to Submit Self-Monitoring Reports in Accordance with Permit Requirements**

143.    As reflected in Exhibit 1, the Facility has failed to report the self-monitoring reports in accordance with the Permit in a multitude of ways, all of which deprive the public of access to information about their local waters.

144.    The Facility does not present all testing parameters in the prescribed tabulated format. Permit at Attachment E § 7.2.7.1.  Since December 2020, the Facility has consistently neglected to include the monthly percentage removal of CBOD and TSS in the tabulated format, a mandatory requirement outlined in the Permit. Moreover, the Facility has omitted reporting chronic toxicity data in the tabulated reports since 2019, which is also a clear violation of the Permit. Failing to disclose these results deprives the public of an opportunity to stay informed and aware of their water quality conditions.

145.    The Facility also neglected to document a staggering total of 239 effluent violations as mandated by the Permit in the specified violations tab on CIWQS. Permit at Attachment at E §7.2.7.3.  These omissions result in underreporting and significant informational harm to Plaintiffs' members and the public.

146.    The Facility's monitoring reports also fail to detail the corrective actions taken for effluent violations within both the self-monitoring cover letter and the violations tab.  In a startling number of instances, amounting to at least 235 violations, the Facility neglected to report infractions in either the violations tab or cover letter. Consequently, corrective actions, as mandated by the Permit, were not documented, and possibly not implemented.

147.    Further, over the past five years, the Facility has consistently failed to provide the necessary corrective action descriptions in the cover letter, the designated location specified in the Permit for such information.

FIRST AMENDED COMPLAINT                    24

148.   The Facility also failed to submit the August 2019 monthly self-monitoring report entirely. The uploaded data represents the quarterly information only. Further, in November 2019, the flow reported in the tabulated format fails to match the flow reported on the cover letter. Given that the flow on the cover letter exceeds the effluent limitation, and the tabulated amount does not, the conflicting information only serves to confuse the public and regulators.

149.   Lastly, numerous reports were submitted after the deadline or not at all. Permit at Attachment E § 7.2.7.2.

150.   Plaintiffs are informed, believe, and thereon allege that these reporting deficiencies have not been corrected and constitute ongoing violations.

**E.    Veolia Water and USIBWC's Roles in Permit Compliance**

151.   Veolia Water is the current operator of the Facility.

152.   On or about September 28, 2020, USIBWC entered into a contract with Veolia Water for Facility operations.

153.   With the exception of the SBOO drop shaft, tunnel, and riser, Veolia Water is responsible for all Facility, canyon collector, and pump station operation and maintenance.

154.   Pursuant to the contract, Veolia Water is required to perform "full service operation and maintenance" of the Facility, which is defined as:

> [C]ontract management, planning, supervision, administration, personnel; plant influent and effluent sampling and laboratory testing; equipment operation, maintenance, servicing, repair and replacement; system monitoring and operation; data recording and reporting; markups of plant as builts; management and reporting; quality control; capital improvements; vehicles and vehicle fleet management, operation, maintenance and repair; housekeeping; grounds maintenance; consumable supplies including chemicals, and other services related to the operation and maintenance of the SBIWTP.

155.   The contract further provides that Veolia Water's operations and

maintenance responsibilities include:

> Canyon Collection Systems (Smuggler's Gulch, Goat Canyon, Stewart's Drain, Silva Drain, and Canyon Del Sol), and Pumping and Conveyance Facilities; including canyon collector pumping stations (Goat Canyon and Hollister Street), which are equipped with emergency generators and odor control systems, and the SBLO from the SBIWTP up to and including the SBOO drop shaft sewage air valve assemblies. All of these facilities are included as part of this scope of work. The Ocean Outfall drop shaft, tunnel and riser are not part of this scope of work. [Veolia Water] shall be solely responsible for clearing and properly disposing off-site of all debris, trash, material, etc., removed from the Canyon Collection Systems, and Pumping and Conveyance Facilities…during regular operations, maintenance and repair activities. Materials and debris accumulated during the cleaning and clearing operations of the Canyon Collection Systems, and Pumping and Conveyance Facilities shall not be returned to SBIWTP and facilities or to Mexico for disposal and shall be disposed off-site properly within seven (7) calendar days after the cleaning and clearing of each event.

156.   Veolia Water is contractually obligated to, in accordance with the Permit, conduct inspections of each canyon collector and pumping station at least once per day.

157.   Veolia Water is responsible for performing all tasks in response to a transboundary flow as required by the Spill Prevention Plan and for implementing "all aspects" of the Plan.

158.   Pursuant to its contract with USIBWC, Veolia Water is responsible for providing the necessary sampling and testing program in accordance with the Permit, including influent and effluent sampling and analysis.

159.   Veolia Water and USIBWC prepared the most recent Spill Prevention Plan, dated October 1, 2024.

160.   The aforementioned Spill Prevention Plan states: "…there are several functional roles within the Permit, which the Operator of the facility, USIBWC's

FIRST AMENDED COMPLAINT                26

designee, has the responsibility to complete via contract. The Operator at the time this Plan was finalized is [Veolia Water]."

161.    As the Operator of the Facility, Veolia Water is responsible for, inter alia, (1) implementation of the Spill Prevention Plan, (2) implementation of Asset Management Plan components, and (3) maintenance of critical infrastructure and canyon collector systems. Permit at Attachment F §1.1; September 25, 2024 NOV at 2.

162.    The October 1, 2024 Spill Prevention Plan lists USIBWC's and Veolia Water's respective roles and responsibilities:

- While USIBWC has overall responsibility for the development and implementation of Plan, development and implementation responsibility is delegated to [Veolia Water] as USIBWC's contracted Operator.

- Veolia [Water] Operations division operators are responsible for the canyon collectors' daily inspections, cleanups, and reporting.

- Veolia [Water], CILA, and CESPT Operators will make contact as necessary to ensure the coordinated operation of the wastewater infrastructure.

163.    Veolia Water inspects the canyon collectors daily and completes the associated inspection logs. Through these inspections, Veolia Water staff identifies and reports canyon collector transboundary flow events and spills.

164.    Veolia Water is responsible for keeping the canyon collectors free from debris "to ensure that dry weather sewage flows are captured at all times."  April 2023 Spill Prevention Plan, at 10.

165.    Veolia Water "will maintain equipment in a state of operational readiness and will deploy the equipment to mitigate, contain, and/or prevent Dry Weather Canyon Collector Transboundary Flows to the extent practicable." *Id*. at 11.

166.    Veolia Water is supposed to remove debris, trash, and sediment from canyon collectors within seven days. *Id*. at 10.

167.    During large dry weather transboundary flows, Veolia Water is required to make hourly visits to the canyon collector and, if safe, clean sediment to prevent

FIRST AMENDED COMPLAINT              27

1  overflow. *Id.* at 11.

2      168.   After wet weather events, Veolia Water is required to clear the canyon

3  collectors of sediment and put the collectors back into operation. *Id.*

4      169.   Veolia Water "coordinates the cleanup of the spill or transboundary flow"

5  events, which may include:

6          Collection of trash, sediment, rocks, and other liquid or solids debris; Vacuum truck

7          recovery of wastewater or polluted water and wash down water; Cleanup of the

8          impacted storm drains in accordance with NPDES storm water permit; [Veolia

9          Water] leads the cleanup efforts within the drain/collectors of spill and

10         transboundary flow events. *Id.* at 14-15; October 1, 2024 Spill Prevention Plan, p.

11         15.

12     170.   In the Spill Prevention Plans, Veolia Water emphasizes the importance of its

13 role in reducing Spill Events. For example, the Plans acknowledge it is "extremely

14 important" to identify and communicate transboundary flows and spill events. April 2023

15 Spill Prevention Plan at 13; October 1, 2024 Spill Prevention Plan at 13. Veolia Water is

16 typically the first to identify a flow event. *Id.*

17     171.   Veolia Water wrote the most recent Facility Asset Management Strategy,

18 released in July 2022. The Asset Management Strategy lists the procedures that Veolia

19 Water implements to maintain critical infrastructure for the Facility.

20     172.   Through the Asset Management Strategy, "[US]IBWC and its business

21 partner Veolia [are held] accountable for maintaining Best Practices (BPs) in asset

22 management of South Bay International Wastewater Treatment Plant (SBIWTP)." These

23 BPs "are expected to ensure adequate capacity and reliability of the SBIWTP assets for

24 environmentally compliant operations." Asset Management Strategy at 3.

25     173.   The Asset Management Strategy relies exclusively on Veolia Water

26 designed and developed programs. Asset Management Strategy at 6.

27     174.   Veolia Water assesses and maintains critical infrastructure through (1)

28 implementing preventative and predictive maintenance (2) scheduling and tracking work

FIRST AMENDED COMPLAINT                    28

1   orders, (3) maintaining inventory and purchasing "critical spare parts and equipment,"

2   and (4) "optimiz[ing] budget management and maintain[ing] a record of life-cycle costs."

3   Asset Management Strategy at 6.

4       175.   Veolia Water is supposed to inspect pipes and valves daily and issue

5   corrective work orders as needed. Asset Management Strategy at 7.

6       176.   Veolia Water uses its VAMS (Veolia Asset Management System) to track

7   workflows, identify current and future operational needs, and identify "purchasing, spare

8   parts, depreciation, condition, and criticality." Asset Management Strategy at 7.

9   According to Veolia Water, VAMS allows it to "efficiently manag[e] asset life cycles,

10  streamli[ne] maintenance operations, maximizing supply chain management, galvaniz[e]

11  safety, and maintain[] regulatory compliance." Asset Management Strategy at 7.

12      177.   To determine Facility needs, Veolia Water performs the criticality

13  assessment for Facility infrastructure, an assessment designed to prioritize equipment

14  repairs. Asset Management Strategy at 8.

15      178.   Veolia Water uses its life cycle data to determine the end-of-life estimate for

16  critical infrastructure. Asset Management Strategy at 10.

17      179.   Veolia Water advises USIBWC on budget and capital planning based on its

18  evaluations. Asset Management Strategy at 11.

19      180.   On information and belief, Veolia Water uploads Facility monitoring data to

20  CIWQS.

21      181.   On information and belief, Veolia North was the Facility operator prior to

22  September 28, 2020 and its contractual obligations at the time were similar to the existing

23  obligations of Veolia Water.

24      182.   USIBWC is the discharger named on the Permit and owns the Facility.

25  Permit at Attachment F, Table F-1.

26      183.   USIBWC has contractual authority to control Veolia Water operations at the

27  Facility. *See* Permit at Attachment F §1.1.

28      184.   For transboundary flows, USIBWC determines "the nature and impact of the

FIRST AMENDED COMPLAINT          29

1    event" and calls for additional backup support if needed. October 1, 2024 Spill

2    Prevention Plan at 13.

3        185.   USIBWC uses the Asset Management Strategy to project future needs for

4    the Facility. Asset Management Strategy at 11.

5        186.   USIBWC and Veolia Water both (1) upload data to CIWQS and (2) write

6    cover letters for the Facility monitoring reports uploaded to CIWQS.

7        187.   On information and belief, Veolia Water collects Facility sampling data.

8        188.   In sum:

9        USIBWC contracts with [Veolia Water] to operate and maintain the . . . Facility.

10       Veolia has contractual obligations to properly operate and maintain the entire

11       Facility except the SBLO and SBOO. USIBWC is responsible to ensure that the

12       obligations contained in its contract with Veolia [Water] are adequate to achieve and

13       maintain compliance with the conditions of the [Permit]. USIBWC is also

14       responsible to ensure that the Veolia [Water] contract is executed, managed and, if

15       needed, modified in a manner that achieves and maintains compliance with the

16       conditions of the Order. September 25, 2024 NOV at 2.

17       189.   USIBWC and Veolia Water have failed and continue to fail to execute their

18   responsibilities under the Permit.

19       190.   Veolia Water has failed and continues to fail to "effectively prioritiz[e] and

20   facilitat[e] maintenance and replacement of Facility assets to prevent unauthorized

21   discharges of waste from the Facility." *See* September 25, 2024 NOV at 11.

22       191.   Veolia Water and USIBWC were "aware since at least July 2023 that both

23   25-year-old surge tanks at the Hollister Street Pump Station had 'not been inspected since

24   the original installation date' and based upon USIBWC and/or Veolia 'staff observations,

25   the tanks [were] partially full of grit.'" September 25, 2024 NOV at 11.

26       192.   Veolia Water failed to identify the Hollister Street Pump Station on the

27   Asset Management Strategy plan's "Quarterly Compliance Assurance Report."

28   September 25, 2024 NOV at 12.  Veolia Water and USIBWC knew that the pump station

FIRST AMENDED COMPLAINT                    30

scored "poor to very poor in performance condition." September 25, 2024 NOV at 12. However, neither entity took measures to maintain the infrastructure. This failure has resulted in millions of gallons of unpermitted discharges.

193. On information and belief, as a result of Veolia Water's failure to properly maintain Facility equipment and identify Facility equipment requiring maintenance or repair, the Facility has failed to properly treat wastewater discharges at the SBOO, resulting in the Facility's ongoing Effluent Limitation violations.

194. USIBWC has a history of failing to submit permit-required reports in a timely manner. USIBWC submitted both the Spill Prevention Plan and Asset Management Strategy over a year late and has yet to adequately implement the plans. September 25, 2024 NOV at 9-13.

195. On information and belief, as a result of errors in Veolia Water's upload of Facility monitoring data, lab results were not correctly uploaded to CIWQS.

## VI.    CLAIMS FOR RELIEF
### FIRST CAUSE OF ACTION
**Discharges of Waste in Violation of the Permit's Effluent Limitations and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)**

196. Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

197. Defendant USIBWC owns the Facility and is the Discharger named on the Permit.

198. Defendant USIBWC is responsible for ensuring the Facility's compliance with Permit Effluent Limitations.

199. Defendant Veolia Water operates the Facility.

200. Defendant Veolia Water is responsible for operating and maintaining the Facility in a manner that complies with Permit Effluent Limitations.

201. As a result of Veolia Water's failure to properly operate and maintain the SBIWTP, the Facility routinely discharges pollutants in violation of the Permit's effluent

limitations.

202.   The Facility has discharged and continues to discharge pollutants in violation of the Permit's effluent limitations. The Facility has violated the Permit's effluent limitations in at least 500 instances between January 30, 2019 and the present.

203.   The discharge of pollutants in excess of a Facility's effluent limitations is a violation of the Clean Water Act, 33 U.S.C. Sections 1311(a) and 1342.

204.   Defendants' violations of the Permit and the CWA are ongoing and continuous. Defendants will continue to be in violation of the Permit and CWA each day the Facility fails to comply with the Permit's Effluent Limitations.

205.   Each of these effluent exceedances is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a). Many of these exceedances equate to weeks or months of continuous violations as noted in Exhibit 1. Plaintiffs are informed, believe, and thereon allege that USIBWC and Veolia were in violation for at least 1,430 days within the last five years.

206.   By committing the acts and omissions alleged above, Defendant Veolia Water is subject to an assessment of civil penalties for each and every violation of the CWA occurring from January 30, 2019 to the present pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

207.   This action for injunctive relief is authorized by the Clean Water Act, 33 U.S.C. § l365(a). Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiffs, for which harm they have no plain, speedy, or adequate remedy at law.

208.   Wherefore, Plaintiffs pray for relief as set forth below.

/././

/././

/././

/././

/././

## SECOND CAUSE OF ACTION

### Discharges in Violation of the Permit's Section 3 Discharge Prohibitions and Clean Water Act.

### 33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)

209.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

210.   Defendant USIBWC owns the Facility and is responsible for ensuring compliance with Permit Discharge Prohibitions.

211.   Defendant Veolia Water operates the Facility.

212.   Defendant Veolia Water is responsible for operating and maintaining the Facility in a manner that complies with Permit Discharge Prohibitions.

213.   As a result of Veolia Water's failure to properly operate and maintain the canyon collectors and pump stations, dry weather transboundary flows less than or equal to the canyon collector's maximum design capacity are routinely not captured by the canyon collector for treatment at the SBIWTP and disposal through the SBOO.

214.   These discharges constitute Spill Events and are subject to the Permit's Discharge Prohibition 3.3, for which there is no "safe harbor" provision.

215.   Defendants have failed and continue to fail to comply with Permit Discharge Prohibition 3.3. Specifically, Defendants' discharges exceed applicable Basin Plan water quality objectives, at the point of discharge, in violation of Basin Plan and Discharge Prohibitions. *See* Basin Plan at 4-31.

216.   Discharging pollutants in excess of a permit's discharge prohibition is a violation of the Clean Water Act, 33 U.S.C. Sections 1311(a) and 1342.

217.   By committing the acts and omissions alleged above, Defendant Veolia Water is subject to an assessment of civil penalties for each and every violation of the CWA occurring from January 30, 2019 to the present pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

218.   This action for injunctive relief is authorized by the Clean Water Act, 33 U.S.C. § l365(a). Continuing commission of the acts and omissions alleged above will

irreparably harm Plaintiffs, for which harm they have no plain, speedy, or adequate remedy at law.

219.    Wherefore, Plaintiffs pray for relief as set forth below.

### THIRD CAUSE OF ACTION

**Failure to Submit Self-monitoring Reports in Accordance with Permit Requirements**

**33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)**

220.    Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

221.    Defendant USIBWC owns the Facility and is responsible for ensuring compliance with Permit monitoring and reporting requirements.

222.    Defendant Veolia operates the Facility and is responsible for operating and maintaining the Facility in a manner that complies with Permit monitoring and reporting requirements.

223.    Defendant USIBWC has failed to upload all self-monitoring reports to CIWQS as required by the Permit at Attachment E Section 7.2.1. USIBWC has failed to timely submit self-monitoring reports and to include all effluent violations to the CIWQS "violations" tab.

224.    Where it assumed USIBWC's reporting responsibilities, Defendant Veolia Water failed to upload the Facility's self-monitoring reports to CIWQS as required by the Permit at Attachment E Section 7.2.1. Defendant Veolia Water has failed to timely submit the Facility's self-monitoring reports and to include all effluent violations to the CIWQS "violations" tab.

225.    Defendant USIBWC has failed to ensure that its contractor uploaded all monitoring reports to CIWQS as required by the Permit at Attachment E Section 7.2.1. USIBWC has failed to attach accurate cover letters to its monitoring reports as required by the Permit.

226.    Plaintiffs are informed, believe, and thereon allege that Defendants'

FIRST AMENDED COMPLAINT                    34

1    monitoring and reporting violations, as alleged herein, are ongoing.

2    227.    Defendants will continue to be in violation of the Permit and the CWA each

3    and every day they fail to monitor and report in the manner prescribed by the Permit.

4    228.    Failure to comply with a CWA permit condition is a violation of the Clean

5    Water Act, 33 U.S.C. Sections 1311(a) and 1342.

6    229.    Each day that Defendants operate the Facility without complying is a

7    separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

8    230.    By committing the acts and omissions alleged above, Defendant Veolia

9    Water is subject to an assessment of civil penalties for each and every violation of the

10    CWA occurring since January 30, 2019. 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. §

11    19.4.

12    231.    This action for injunctive relief is authorized by the Clean Water Act, 33

13    U.S.C. § l365(a). Continuing commission of the acts and omissions alleged above will

14    irreparably harm Plaintiffs, for which harm they have no plain, speedy, or adequate

15    remedy at law.

16    232.    Wherefore, Plaintiffs pray for relief as set forth below.

17    **VII.    RELIEF REQUESTED**

18    233.    Plaintiffs respectfully request that this Court grant the following relief:

19    a.    A court order declaring Defendants have violated and are in violation of

20    Sections 301(a) and (b) of the Clean Water Act, 33 U.S.C. §§ 1311(a) and (b), for

21    discharging pollutants from the Facility in violation of a permit issued pursuant to

22    Section 402(p) of the CWA, 33 U.S.C. § 1342(p), and for failing to comply with the

23    other substantive and procedural requirements of the Permit as set forth within this

24    Complaint;

25    b.    A court order enjoining Defendants from discharging pollutants from the

26    Facility in violation of the Clean Water Act and the Permit;

27    c.    A court order requiring Defendants to implement affirmative injunctive

28    measures designed to eliminate Defendants' violations of the substantive and procedural

FIRST AMENDED COMPLAINT              35

requirements of the Permit and the Clean Water Act as authorized by U.S.C. section 1365(a);

     d.     A court order assessing civil monetary penalties against Defendant Veolia Water;

     e.     A court order awarding Plaintiffs their reasonable costs of suit, including attorney, witness, expert, and consultant fees, as permitted by Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d); and

     f.     Any other relief the Court deems appropriate.

Dated: March 7, 2025

                                         Respectfully submitted,

                                         COAST LAW GROUP LLP
By: s/Livia B. Beaudin
LIVIA B. BEAUDIN
Attorney for Plaintiffs
COASTAL ENVIRONMENTAL
RIGHTS FOUNDATION
E-mail: livia@coastlawgroup.com

SAN DIEGO COASTKEEPER
By: s/Patrick McDonough
PATRICK MCDONOUGH
Attorney for Plaintiffs
SAN DIEGO COASTKEEPER
E-mail: patrick@sdcoastkeeper.org